**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**KIMBERLY WHEATLEY,**

      **Plaintiff,**

**vs.**                        **Case No.  4:12-cv-595-WS/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

      This is a Social Security case referred to the undersigned United States

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review

of the final determination of the Commissioner of the Social Security Administration

(SSA) denying Plaintiff's applications for disability and Disability Income Benefits (DIB)

and Supplemental Security Income (SSI) prior to February 21, 2011.  After careful

consideration of the entire Record, it is respectfully recommended that the decision of

the Commissioner be affirmed.

**I.  Procedural History of the Case**

      On November 30, 2009, Plaintiff, Kimberly Wheatley, filed a Title II application for

a period of disability and DIB, and a Title XVI application for SSI, alleging disability

beginning on March 1, 2008, due to clubfeet, arthritis, thyroid, high blood pressure,

menopause, and osteopenia.  R. 19, 162-67, 183.  (Citations to the Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured, or the date by which her disability must have commenced in order to receive DIB under Title II, was December 31, 2011.  R. 19.

Plaintiff's applications were denied on March 31, 2010, and upon reconsideration on September 2, 2010.  R. 19, 96-102, 109-13.  On October 1, 2010, Plaintiff requested a hearing.  R. 19, 114.  On August 23, 2011, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Charles Wm. Dorman, in Tallahassee, Florida.  R.19, 46-71.  Plaintiff was represented by Inessa Meyerovich, an attorney.  R. 19, 40-39, 41-42, 103-06, 149-50.  Gail E. Jarrell, an impartial vocational expert, also testified.  R. 19, 72-79, 153-55 (Resume).

On November 21, 2011, the ALJ issued a decision and found Plaintiff was not disabled prior to February 21, 2011, but she was deemed disabled on February 21, 2011, under the Medical-Vocational Guidelines (the Grids) when her age category changed to an individual closely approaching advanced age (age 50-54).  R. 31-32.[1]  On January 11, 2012, Plaintiff requested review of the ALJ's decision.  R. 12-14.  On September 10, 2012, the Appeals Council denied Plaintiff's request for review.  R. 1-4.  The ALJ's decision stands as the final decision of the Commissioner.

On November 12, 2012, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 13 and 15, which have been considered.

---

[1]  Plaintiff was born on February 22, 1961, and turned 50 years of age on that date.  R. 162, 164, 171, 179, 423.  This appears to be a scrivener's error.  *See generally* Diorio v. Heckler, 721 F.2d 726 (11th Cir 1983).  Defendant does not argue that error resulted.  Doc. 15.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant meets the insured status requirements of the Social Security Act through December 31, 2011." R. 21.

2. "The claimant has not engaged in substantial gainful activity since the alleged onset date," March 1, 2008. *Id.*

3. "Since the alleged onset date of disability, March 1, 2008, the claimant has the following severe impairments: lumbago, rheumatoid arthritis, bilateral clubfeet, pain disorder, and obesity." *Id.*

4. "Since the alleged onset date of disability, March 1, 2008, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 22.

5. "[S]ince March 1, 2008, the claimant has the residual functional capacity [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), further she must avoid the use of ladders, ropes, or scaffolds; but can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; must avoid concentrated exposure to workplace hazards, such as moving machinery and unprotected heights; and is limited to work that is simple, routine, and repetitive in nature." R. 23.

6. "Since March 1, 2008, the claimant has been unable to perform any past relevant work." R. 29. "The demands of the claimant's past relevant work as a real estate manager, real estate agent, and investigator exceed the [RFC]." R. 30.

7. "Prior to the established disability onset date, the claimant was a younger individual age 18-49. On February 21, 2011, the claimant's age category has changed to an individual closely approaching advanced age." *Id.*; *but see supra* n.1.

8. "The claimant has at least a high school education and is able to communicate in English." *Id.*

9. *"Prior* to February 21, 2011, the date the claimant's age category changed, considering the claimant's age, education, work experience and [RFC], there were jobs that existed in significant numbers in the national economy that the claimant could have performed." *Id.* (emphasis added).

10. "*Beginning* on February 21, 2011, the date the claimant's age category changed, considering the claimant's age, education, work experience and [RFC], there are *no* jobs that exist in significant numbers in the national economy that the claimant could perform." R. 31 (emphasis added).

11. "The claimant was not disabled *prior* to February 21, 2011, but *became disabled on that date* and has continued to be disabled through the date of this decision." R. 32 (emphasis added).

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[2]

---

[2] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 404.1509, 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), (e) & (g), 416.920(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear.  20 C.F.R. § 416.927.  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion as "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the

opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors. 20 C.F.R. §§ 404.1527(b) & (c), 416.927(b) & (c).

## IV. Legal Analysis

### A. Issues for Determination

Plaintiff argues that the ALJ erred by (1) failing to properly evaluate the opinion of Angela D. Myers, ARNP, a treating nurse, which led to an erroneous RFC assessment; (2) finding that Plaintiff was not a credible witness; and (3) finding that Plaintiff has the ability to perform other work in the national economy. Doc. 13 at 1, 11-17.[3] The Commissioner argues substantial evidence supports the ALJ's decision to (1) discount the weight of the opinion of Ms. Myers; and (2) the ALJ's credibility finding of Plaintiff; and further (3) the hypothetical questions posed to the vocational expert accounted for Plaintiff's limitations, and, as a result, the ALJ did not err in finding that Plaintiff can perform work in the national economy that pre-dated his finding of disability. Doc. 15 at 3, 12-19.

### B. The Evidence

### 1. Relevant Medical Evidence

### Angela D. Myers, ARNP

It appears Plaintiff's first visit with Ms. Myers of the Medical Healing Clinic in Tallahassee, Florida, was on January 2, 2007. R. 25, 303. Plaintiff was observed in no acute distress with an unremarkable neck exam and oriented x3. Diagnoses included

---

[3] The ALJ refers to Ms. Myers with the ARNP designation, R. 25, as does Plaintiff, doc.13 at 4, whereas the Defendant does not, doc.15 at 6. Throughout the record, Ms. Myers' patient notes and other records have the designation "N.P." after her name. *See, e.g.*, R. 290-303, 423, 427-28, 433, 437, 439-40, 442-43, 446, 448-51. Other records mention Ms. Myers with the designation ARNP or ARNP-C. *See, e.g.*, R. 424, 435, 447, 458. For the purpose of this opinion, it is assumed that Ms. Myers has the "ARNP" designation in accordance with the ALJ's finding.

hyperthyroidism and osteopenia.  *Id.*  On February 13, 2007, Ms. Myers re-checked Plaintiff's thyroid; Plaintiff was again oriented x3 with an unremarkable neck exam. R. 25, 302.  Ms. Myers added a diagnosis of anxiety.  *Id.*  During a GYN check-up on June 14, 2007, Plaintiff appeared in no acute distress and, in general, unremarkable findings are noted, although like many of Ms. Myers' notes, they are difficult to read. R. 301.  During a December 19, 2007, examination, Plaintiff was in no acute distress, oriented x3, and an unremarkable neck examination is noted.  R. 25, 299.  Ms. Myers added the diagnosis of hyperlipidemia and Ms. Myers recommended conservative treatment with medication.  *Id.*  By February 14, 2008, Ms. Myers reported Plaintiff "doing well on" medication and that Plaintiff "feels better," was without evidence of edema and, as in the past, in no acute distress and oriented x3.  R. 25, 297, 451.

By June 12, 2008, Ms. Myers found Plaintiff in no acute distress, oriented x3, without edema or clubbing in her extremities.  Ms. Myers' impressions included hypothyroidism, knee pain, and menopausal symptoms.  R. 25, 296, 450.  Visits in July and August 2008 and January and April 2009 were unremarkable, except for a report of back pain in April 2009, although Plaintiff was not in acute distress and oriented x3. R. 292-95, 443-44, 446-49.  Ms. Myers continued to report Plaintiff in no acute distress, with an unremarkable thyroid, and without clubbing or edema through November 2009, although she added a diagnosis of hypertension.  R. 25, 290-91, 438-39.  Plaintiff returned to Ms. Myers in April 2010 and was in no acute distress, fully alert and oriented, without thyroid masses or nodules, and had normal lab work results.  R. 26, 436-37.

During her July 14, 2010, checkup, Plaintiff requested Ms. Myers to complete a functional capacity questionnaire for Social Security disability benefits. R. 26, 424, 435. (Ms. Myers was now associated with The Medical Healing Center, LLC, in Tallahassee, her notes are typewritten, and she has the designation of ARNP-C. R. 424, 435.) Ms. Myers noted that Plaintiff had been referred to Neighborhood Health Clinic (NHC) for ankle pain and club feet. Ms. Myers reported tenderness in Plaintiffs ankles, right greater than left; bilateral club feet and tenderness of feet; negative back CVAT; generalized lumbosacral pain; and no crepitus. Naproxen seemed to help Plaintiff with her joint pain. R. 424, 435. Her impressions were; chronic ankle pain, hypothyroidism, hypertension, arthritis, and bilateral club feet. *Id.* Ms. Myers opined that Plaintiff "is suffering from fatigue and pain due to her club feet and arthritis in the ankles." *Id.* Ms. Myers prescribed Lisinopril and Naprosyn. *Id.* Based on these opinions, the ALJ stated:

> To the extent Ms. Meyer's [sic] opinions regarding the claimant's fatigue and claim our work-related restrictions, I find they are consistent with limiting the claimant to a reduced range of sedentary work and afford them only some weight, as she is not considered an acceptable medical source (23F/4).

R. 26, 424, 435.

Ms. Myers also completed a two-page RFC questionnaire on July 14, 2010. R. 26, 389-90. The "[q]uestionnaire was filled out during this visit with the patient." R. 424. Ms. Myers opined that Plaintiff's symptoms, namely chronic pain and fatigue and weakness, constantly interfere with her attention and concentration required to perform simple work-related tasks. R. 389. Ms. Myers did not identify any side effects from medications. *Id.* She further opined that Plaintiff was unable to walk without rest or significant pain, could not sit or stand for more than five minutes total in a day, would

need to recline or lie down during the day in excess of her scheduled breaks, and was generally "unable to work." *Id.* Ms. Myers stated Plaintiff could lift/carry objects weighing less than 10 pounds frequently and could never lift/carry more than 10 pounds, had limitations doing repetitive reaching, handling, or fingering and could only use her hands, fingers, and arms 10% of the time during an eight-hour workday. R. 390. She also opined that the Plaintiff would likely be absent from work more than four times per month because of her conditions of club feet, arthritis, and hypertension and further that she was not a malingerer and "unable to work now" and the prognosis was poor. R. 389. After summarizing Ms. Myers opinions, the ALJ stated:

> Ms. Myers, however, is not an acceptable medical source. More importantly, however, her residual functional capacity questionnaire statements are inconsistent with her above-cited observations documented in treatment notes from that time. Accordingly, I give these inconsistent opinions from Ms. Myers little weight.

R. 26.

Plaintiff's next visit with Ms. Myers was on March 23, 2011. R. 423. Plaintiff reported she needed "something else" for her ankle pain because Diclofenac was giving her gas and heartburn. Plaintiff was in no acute distress, oriented x3, no thyroid masses or nodules were found, and Plaintiff's right leg had no clubbing or edema whereas her left leg and ankle had edema but no clubbing, although Plaintiff had clubbed feet. *Id.* Impressions included hypothyroidism, osteopenia, GERD, and joint pain and two other impressions, one related to menopause and the other illegible. *Id.* Flexeril was prescribed among other medications. *Id.*

On July 6, 2011, Plaintiff reported to Ms. Myers for her yearly check-up to get a handicap parking sticker, to sign her student loan discharge papers, and to complete a

functional capacity evaluation for her attorney.  R. 27, 427.  Ms. Myers noted that

Plaintiff was in no acute distress and oriented x3, but Plaintiff's extremities had limited

and painful range of motion, chronic pain because of her clubbed feet,

temporomandibular joint disorder, and chronic fatigue and weakness.  *Id.*

Ms. Myers also completed a second two-page RFC questionnaire on July 6,

2011, R. 458-59, which is nearly identical to the first RFC questionnaire completed on

July 14, 2010, R. 389-90, with the additional limitations/symptoms such as chronic pain,

difficulty walking, and "borderline DM type/I TMJ Osteo."  Prognosis was poor.  After

summarizing Ms. Myers opinions, the ALJ stated:

> While I have determined the record supports limiting the claimant to a reduced
> range of sedentary work since her alleged onset date, the record does not
> establish such significant restrictions as suggested by Ms. Myers.
> Despite the claimant being disabled under the Medical-Vocational Guidelines as
> of February 21, 2011, the restrictions set forth by Ms. Myers continued to be
> inconsistent with her treatment notes.  Furthermore, I again note that Ms. Myers
> is not considered an acceptable medical source.  Accordingly, I give little weight
> to her inconsistent opinions from July 2011 (25F).

R. 27.

### Bond Community Health Center (BCHC)

Plaintiff presented to BCHC on November 5, 2009, and complained of possible

urinary tract infection.  R. 25, 281, 323.  She noticed "that the pain is now sort of

radiating to her back."  Ceretha Thomas, ARNP, noted Plaintiff's past medical history as

"remarkable for hypothyroidism and arthritis."  Although Ms. Thomas documented

elevated blood pressure, she indicated Plaintiff was in very good spirits and was without

edema, cyanosis, or clubbing.  R. 281, 323.  Cipro was prescribed.  *Id.*  BCHC progress

notes indicate Plaintiff was a "no show" for November 13 and 19, 2009, appointments.

R. 321.

**Neighborhood Health Services, Inc. (NHS)**

On July 30, 2009, Plaintiff presented to NHS as a new patient and was seen by Oretha W. Jones, ARNP.  R. 25, 336-37.  A physical exam produced normal results.  R. 336.  Ms. Jones' impressions/diagnoses were hypothyroidism, and rheumatoid arthritis without any explanation.  R. 336-37.  On September 28, October 13, and December 15, 2009, Plaintiff presented at NHS and was seen by Ms. Jones.  The results of the physical exams were the same as were the impressions/diagnoses.  R. 330-335.  The ALJ noted "that no objective evidence of rheumatoid arthritis appeared in the claimant's records from that period to support her supplemental diagnosis (6F/6-13)" of rheumatoid arthritis.  R. 25.

On July 26, 2010, Plaintiff presented to NHS and was examined by Ms. Jones.  R. 27, 392-94.  The chief complaint is noted as "referral to TOC."  R. 392.  Hypothyroidism, unspecified, and rheumatoid arthritis, both with an onset date of October 13, 2009, are mentioned.  *Id.*  Under review of systems, musculoskeletal system, the comment "pelvic pain" is noted followed by "positive for: joint pain," followed by another comment--"left ankle pain with a history of club foot."  *Id.*  Under "physical exam" it is noted that Plaintiff "does not appear acutely ill," is "alert," and other comments.  R. 393. The results of the respiratory and cardiovascular exams were normal.  *Id.*  Pelvic pain, suprapubic pain, and pain due to history of club foot left ankle and foot are noted.  *Id.*  Ms. Jones listed several impressions/diagnoses: hypothyroidism, unspecified; rheumatoid arthritis; difficulty in walking; other acquired deformities of the left ankle and foot; and "osteoarthrosis localized primary involving pelvic region and thigh."  *Id.*  Plaintiff reported that she needed a referral to TOC due to

her left ankle pain; she stated that she was born with club feet.  It appears Plaintiff was referred to Southern Medical Internists for pelvic pain related to her arthritis.  *Id.*  Lab work was ordered.  R. 394. 396-98.  The ALJ again noted that Ms. Jones maintained her October 2009 diagnosis of rheumatoid arthritis "without citing objective evidence or signs that substantiated the same."  R. 27.

On August 18, 2010, Plaintiff had a follow-up visit at NHS with Ms. Jones. R. 27, 419-20.  The results from the physical exam were normal.  R. 420.  There were no listed musculoskeletal complaints from Plaintiff's previous visit, and hypothyroidism, unspecified, and rheumatoid arthritis, without explanation, were mentioned.  *Id.* Ms. Jones observed that Plaintiff was cooperative and did not appear acutely ill.  *Id.*

During an October 4, 2010, visit, Ms. Jones documented Plaintiff's complaints of back pain and numbness in her lower extremities.  R. 27, 417.  The general results of the physical exam were normal, except muscle spasms were noted in Plaintiff's cervical spine and para-lumbar muscle spasms noted in her left lumbar spine.  R. 418.  Plaintiff was alert and oriented to time, place, and person.  *Id.*  Ms. Jones added lumbago to her list of impressions/diagnoses without any further explanation.  Plaintiff was referred for an MRI of her complete spine, but the ALJ noted the results are not in the record. R. 27, 418.

On May 5, 2011, Plaintiff returned to NHS where she was treated by Quandara Whaley, ARNP.  R. 415-16.  Plaintiff reported experiencing an "issue with [her] ankle." R. 415.  Plaintiff was prescribed, among other medications, Naproxen.  *Id.*

**2.  Opinions and Consultative Examinations *Prior* to February 21, 2011**

**Carla M. Holloman, D.O.**

On January 28, 2010, Dr. Holloman, of Quincy Family Medicine, conducted a

physical consultative examination for the Office of Disability Determinations.  R. 26,

343-48.  Dr. Holloman reported Plaintiff was applying for disability based on congenital

clubbed feet, osteopenia, arthritis, hypertension, thyroid disease, and menopausal

symptoms.  R. 343.  Plaintiff reported that she was born with clubbed feet and

underwent corrective surgery, but she continued to have pain, especially when walking.

Plaintiff also reported rheumatoid arthritis and osteopenia.  *Id.*  The physical

examination revealed that Plaintiff's gait was antalgic, but steady without the use of

assistive devices.  R. 344.  There was no cyanosis or edema in the extremities and

clubbing is at both feet with high insteps and taut Achilles tendons.  *Id.*  Plaintiff had free

range of motion of all extremities and her grip and muscle strength was 5/5 throughout.

R. 345-48.  None of her joints showed swelling or tenderness and her spine and

extremities were in good alignment and showed no tenderness.  R. 345.  Plaintiff was

able to stand from a seated position without incident.  *Id.*  Plaintiff's neurological

examination was normal.  Plaintiff was able to do tandem walking and the straight leg-

raise testing was negative.  *Id.*

**Marie Hume Guilford, Ph.D.**

On February 12, 2010, Dr. Guilford, a licensed clinical psychologist, with Capital

Psychology Consultants, conducted a mental status evaluation at the request of the

Office of Disability Determinations.  R. 26, 28, 350-53.  Plaintiff drove to the evaluation

and arrived on time.  Her grooming and hygiene were good and she was able to walk,

but had an odd gait.  R. 350.  Plaintiff reported that she suffers "[l]ots of pain.  Some

days are better than others."  *Id.*  Plaintiff described her occupational history, prior

marriages, and the stress of raising two children "with no child support."  Her "body is

just stressed out."  R. 351.  Plaintiff reported that she took care of her activities of daily

living--sleeps late, awakes and drinks some coffee and feeds her dog; checks her

messages, eats, and does "some light stuff around the house"; cannot lift; runs errands

and goes to church once a week; has a couple of friends including realtor friends that

she does things with; takes care of her personnel grooming and hygiene; does the small

chores around the house; "generally able to tolerate the mental demands associated

with work"; but "tends to be distracted by pain most of the time."  *Id.*  Dr. Guilford noted

that Plaintiff's "problems do not significantly impair her ability to follow simple one or

two-step instructions.  She is able to relate adequately with others."  R. 352.  Plaintiff

"displayed no bizarre or inappropriate behaviors" and "[h]er psychomotor behavior was

unremarkable for accelerated or exceptionally slowed physical movement."  Dr. Guilford

found that Plaintiff's appearance, attitude, behavior, concentration, abstract thinking,

fund of knowledge, insight, and judgment were all within normal limits.  *Id.*

Dr. Guilford reviewed Plaintiff's medical records that noted "her physical problems and

pain but there is no indication of any mental health problems or symptoms."  *Id.*  She

diagnosed Plaintiff with pain disorder, not otherwise specified (NOS), noted a fair

prognosis and that Plaintiff was only complaining of physical problems.  *Id.*  The ALJ

afforded Dr. Guilford's opinions great weight.  R. 26, 28.[4]

---

[4]  In January 2010, Plaintiff's relationship counselor, Thomas P. Tyler, provided a
statement opining that Plaintiff seemed "very capable" of performing work-related
mental activities involving understanding and memory, sustained concentration and
persistence, social interaction, and adaptation.  R. 28, 341.  The ALJ stated that

**Thomas Conger, Ph.D.**

On March 29, 2010, Dr. Conger completed a Psychiatric Review Technique (PRT) and concluded Plaintiff had no medically determinable impairments. R. 354. He noted that "[b]ased on the totality of evidence, she appears to be solely limited by her physical difficulties and there are no symptoms severe enough to support a mental diagnosis at this time." R. 366. The ALJ gave little weight to Dr. Conger's finding of no medically determinable impairment "because the record supports the claimant's diagnosis of a pain disorder (12F)." R. 29.

**Sharon Ames-Dennard, Ph.D.**

On June 25, 2010, Dr. Ames-Dennard completed a PRT and determined that Plaintiff impairment (pain disorder) was not severe. R. 374. She determined that the data analysis supported a not severe mental impairment. R. 386. The ALJ gave little weight to Dr. Ames-Dennard's conclusion that Plaintiff's pain disorder is non-severe; afforded great weight to her "assessment of mild difficulties in social functioning, and no episodes of decompensation"; but gave little weight to her "assessment of no restrictions in the claimant's activities of daily living and mild difficulties in the claimant's capacity for maintaining concentration, persistence, or pace. Rather, considering the evidence in a light most favorable to the claimant, I conclude she has mild and moderate restrictions in those areas, respectively (15F)." R. 29.

**Cristina Rodriguez, M.D.**

On September 1, 2010, Dr. Rodriguez completed a physical RFC assessment. R. 399-406. Dr. Rodriguez determined that Plaintiff could occasionally lift/carry 20

---

although Mr. Tyler's opinions were not considered an acceptable medical source, "his opinions are consistent with the overall record and thus accorded some weight." R. 28.

pounds, frequently lift/carry ten pounds, and stand/walk about six hours in an eight-hour

workday. R. 400. Plaintiff had unlimited pushing/pulling abilities and could occasionally

climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but never climb

ladder/rope/scaffolds. R. 400-01. She also should avoid concentrated exposure to

hazards. R. 402-3. The ALJ determined that Dr. Rodriguez was an acceptable medical

source, but her "opinions generally do not carry the same weight as examining or

treating physicians." R. 29. The ALJ gave significant weight to Dr. Rodriguez's

conclusion that Plaintiff is not disabled because it is consistent with the overall

evidence. *Id.* The ALJ found Plaintiff was more limited than suggested by

Dr. Rodriguez and afforded little weight to her exertional limitations. He noted, however,

that the postural and environmental restrictions provided by Dr. Rodriguez were

consistent with the evidence and they were given "great weight." *Id.*

### 3. Opinions and Consultative Examinations *After* February 21, 2011[5]

### Russell W. Rowan, D.P.M.

On August 15, 2011, during and after the time the ALJ found Plaintiff was

disabled, Plaintiff was examined by Dr. Rowan for the purpose of completing paperwork

in connection with Plaintiff's disability claim. R. 27, 462-63. Plaintiff had been seen

several years ago in the same office (Tallahassee Podiatry Associates, P.A.) for similar

problems, although she presented "for essentially initial office visit. R. 462; *see* R. 187

(Dr. Rowan 2006). Dr. Rowan's examination showed Plaintiff had foot weakness, an

unsteady gait (she was carrying a cane), poor posture and balance, and chronic pain

when walking. R. 462. His assessment was: "[r]esidual club foot deformity bilateral,

which has now progressively worsened and affected her gait, [and] her ability to

---

[5] In July 2011, Plaintiff received a disabled person parking permit. R. 277.

ambulate. He opined Plaintiff "is not able to work at this time." R. 463. He did not

opine when Plaintiff's inability to work began. *Id.* He prescribed Lodine and discussed

with Plaintiff the possibility of surgical intervention including fusion of the ankle/foot. *Id.*

Dr. Rowan also completed an RFC questionnaire that is consistent with the above

opinion. He ultimately opined that Plaintiff was "not able to work as a result of

congenital birth defect affecting both lower extremities." R. 466-68. Dr. Rowan's

assessment is similar to Ms. Myers' July 14, 2010, and July 6, 2011, RFC assessments.

R. 389-90, 458-59. The ALJ afforded "great weight" to Dr. Rowan's "examining,

acceptable medical source opinion, as it is consistent with a finding of disability *after* the

claimant's fiftieth birthday." R. 27-28 (emphasis added).

### Eu'Stacia M. Trawick, M.S.

On August 15, 2011, Plaintiff's vocational rehabilitation counselor, Ms. Trawick,

wrote a letter to the ALJ and opined that Plaintiff "is classified as significantly disabled

based on the State of Florida's order of selection. She most certainly requires our

services in order to be gainfully employed." R. 278. She opined that Plaintiff's

disabilities "make it difficulty [sic] to work," but she "will be able to return to work once

she completes her required medical procedures and vocational training. However, it is

unlikely that she will be ready for employment within the next 24 months." *Id.* The ALJ

gave her opinions significant weight "because they are consistent with finding the

claimant disabled as of February 21, 2011." R. 29.

### Sam Mercier

On August 15, 2011, Plaintiff's friend and employer wrote the ALJ advising of Plaintiff's inability "to perform her sit down office duties" so she was let go as of March 1, 2008. R. 280. The ALJ assigned less than significant weight to his opinion. R. 29.

**Jose E. Rodiguez, M.D.**

On September 28, 2011, Dr. Rodiguez completed an RFC questionnaire. R. 471-72. He stated that he saw Plaintiff semi-annually since 2009 and more often in 2010 and 2011. R. 471; *see* R. 187, 190 (Dr. Rodriguez and Ms. Jones/ Neighborhood Health Clinic, 2009).[6] Dr. Rodriguez indicated that Plaintiff's chronic pain would constantly interfere with her ability to concentrate; Plaintiff could sit and stand/walk zero hours in an eight-hour workday; Plaintiff could not lift ten pounds, although she could frequently lift less than ten pounds (Dr. Rohan stated she could occasionally lift less than ten pounds, R. 467); and Plaintiff would miss work more than four times per month. R. 471-72. Dr. Rodriguez's conclusions are similar to those reached by Dr. Rohan, R. 466-67, and Ms. Myers, R. 458-59.

Regarding Drs. Rowan and Rodriguez, the ALJ stated:

Both physicians indicated the claimant was unable to work as of the dates of their evaluations, with no indication that their restrictions applied prior to February 21, 2011. Although the claimant's representative pointed out the doctors' indications that the claimant's clubfeet deformity was a progressively worsening condition, the record and her testimony reflect she was born with that impairment and worked for many years in spite of her condition. I also note that neither physician saw the claimant more than once, if at all in the case of Dr. Rodriguez (28F). While I afford great weight to their conclusions that the claimant has been unable to work since August 2011, I give little weight to their limitations as applying to any time before then. Furthermore, despite their brief encounters with the claimant, their proposed restrictions are nearly identical to those of

---

[6] A Disability Report indicates Plaintiff had a first and last visit with Dr. Rodriguez in 2009 with a next appointment for December 15, 2009. R. 187; *see* R. 190 (sent for blood test and mammogram 2009). As noted above, Plaintiff was examined by Ms. Jones at NHC in 2009 through 2011, not Dr. Rodriguez. *See supra* 12-13.

Ms. Myers, and thus inconsistent with the overall medical evidence of record. As
such, I afford the acceptable medical source opinions of Dr. Rowan and
Dr. Rodriguez regarding the degree of the claimant's limitations little weight.

R. 28.

### 4. Plaintiff's Hearing Testimony and Reports of Impairments

As part of his RFC assessment, the ALJ summarized Plaintiff's complaints that

appear in the record. R. 23-25.

Overall, while the record supports some level of functional limitation related to the
claimant's impairments, it does not support such significant restrictions as
alleged by the claimant. I have specifically considered the effects of all the
claimant's severe and non-severe impairments, both separately and in
combination.

The claimant is a 47-year-old, college-educated individual alleging disability
based on symptoms resulting from her asserted severe impairments. Within her
December 2009 disability report, the claimant contended her conditions of
congenital clubfeet, arthritis, thyroid issues, high blood pressure, menopause,
and osteopenia first limited her ability to work in March 2008. She further
claimed that issues with her bilateral clubfeet had progressively worsened, due to
resulting arthritis and scar tissue from two surgeries. In addition to asserting pain
in her neck, back, hips, and feet from osteopenia and arthritis, she alleged weight
gain from her thyroid issues and menopause, which she stated also worsened
her condition (2E).

In describing how her impairments affected her ability to work, the claimant
contended that she experienced intense fatigue, diminished attention, mood
problems, difficulty with social interaction, an inability to meet employer
expectations, and pain in her neck, back, hips, and feet (2E). She listed
medication side effects of weight gain, affected speech, gas, fatigue, heartburn,
sleepiness, lightheadedness, diminished concentration, blurred vision, acid
reflux, nausea, and dry mouth (2E; 7E; 13E; 14E). I note that no treating or
examining physician has recommended work-related restrictions because of
alleged medication side effects.

In her December 2009 function report, the claimant did not allege any problems
in attending to personal care needs, but asserted increased periods of
sleepiness. She did not indicate the need for reminders to take care of personal
needs or to take medication, admitting she could prepare/warm up simple meals
on a daily basis. The claimant further stated her ability to vacuum, do laundry,
and wash dishes every day, taking her roughly two hours without the need for
help or encouragement. She also reported her ongoing ability to drive, go out in

public alone, shop in stores for groceries every week, pay bills, count change, and use a checkbook or money orders. In describing her social activities, the claimant stated she attended church weekly and did not need reminders or someone to accompany her (5E).

The claimant alleged difficulty getting along with others, handling stress or changes in routine, lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing, seeing, remembering, completing tasks, concentrating, understanding, following instructions, and using her hands in that December 2009 report. She also stated she could walk for 30 minutes before needing to stop and rest for 30 minutes. Although the claimant reported she could only pay attention for 15 minutes, she inconsistently answered that she did not have trouble following either written or verbal instructions. While the claimant noted, "some," use of crutches with pain, she acknowledged that they were not medically prescribed (5E).

Despite the claimant's allegations of daily chest pain in her March 2010 cardiac questionnaire, she admitted that she had never been hospitalized for a heart attack, had an exercise test, or undergone cardiac catheterization/angiography. Within that report, the claimant stated she could climb 10 steps without needing to stop and rest, could lift two pounds without pain, and could walk to her mailbox before becoming out of breath. She further alleged that her kneecap popped out of its joint and that her chest pain felt like squeezing, pressure, burning, flutter, weight on her chest, and shortness of breath (7E).

The claimant's May 2010 disability report included an allegation of changes in her condition; however, she merely stated that her blood pressure, osteopenia, and arthritis had become worse without providing a date of when the changes occurred. The claimant did not assert any new impairments or new physical/mental limitations since completing her previous report. She contended, however, that she struggled to cook, clean, bathe, dress, and leave her home or get out of bed because of pain (9E). In a subsequent August 2010 pain questionnaire, the claimant described her pain as constant and stated that while hot baths and medication helped, they did not relieve her pain. As in previous disability application materials, the claimant alleged difficulty standing for long periods, bathing, completing anything other than light chores, shopping, sitting for long periods, and walking, although she did note that her sleep was improved (10E).

The claimant alleged changes in her condition in her October 2010 disability report of a more erratic sleep pattern, problems with speech, and an inability to focus visually. She additionally asserted pain in her right ear, vertigo, and a, "suspicion," of diverticulitis (13E; 14E). Although the record reveals that the claimant was issued a disabled parking permit in July 2011, the claimant testified that she continues to drive, drove herself to her hearing, cooks for herself, does her own laundry, and continues to live independently (20E).

R. 23-25; *see* R. 46-71 (Plaintiff's hearing testimony).  Thereafter, the ALJ discusses the medical and other evidence in the record discussed herein.

### 5.  The Vocational Expert's Testimony

Ms. Jarrell testified as an impartial vocational expert.  R. 72-75, 78-79. Ms. Jarrell testified that someone of Plaintiff's age, education, and experience who is limited to sedentary work and could never climb ladders, ropes, or scaffolding, but could occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl, needs to avoid concentrated exposure to work place hazards, and limited to simple, routine, repetitive work, would be able to perform the jobs of addresser, office clerk, and surveillance systems monitor.  R. 73-75.  Ms. Jarrell also testified that if such a person were to miss more than three days of work per month, there would be no jobs in the national economy that such a person could perform.  R. 78-79.

### 6.  The ALJ's Determination

The ALJ concluded that *prior* to February 21, 2011, the day before Plaintiff's 50th birthday, *see supra* n.1, Plaintiff's ability to perform all or substantially all of the requirements of a full range of sedentary work was impeded by additional limitations. R. 30-31.  To determine the extent to which these limitations eroded the unskilled sedentary occupational base, the ALJ asked Ms. Jarrell whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and RFC.  Ms. Jarrell opined that such a person could perform several jobs: addresser, office clerk, and surveillance systems monitor.  Each job is classified as unskilled, with SVP of 2, and sedentary.  R. 31, 74-75.  As a result, the ALJ determined that *prior* to

February 21, 2011, a finding of not disabled was appropriate under the Medical-Vocational Guidelines (the Grids), Rule 201.21.  R. 30-31.

The ALJ further determined that Plaintiff became disabled on February 21, 2011, in light of her age change.  As a result, a finding of disabled was reached by direct application of Rule 201.14.  R. 31.

### C.  Substantial evidence supports the ALJ's determination that Plaintiff was not disabled prior to February 21, 2011[7]

### 1.  Consideration of Ms. Myers' Opinions

Plaintiff argues that the ALJ erred in making his RFC assessment when he did not properly evaluate Ms. Myers' July 24, 2010, opinions.  Doc. 13 at 11-14.

Ms. Myers is not an acceptable medical source such as a licensed physician or licensed or certified psychologist or the like.  20 C.F.R. §§ 404.1513(a)(1)-(2), 416.913(a)(1)-(2).  Rather, nurse-practitioners, like Ms. Myers, are considered "other sources."  20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).  "Accordingly, a nurse practitioner's opinion is not entitled to the same weight as afforded the opinion of a treating psychiatrist or psychologist.  Cf. Falge v. Apfel, 150 F.3d 1320, 1324 (11th Cir. 1998)."  Osterhoudt v. Astrue, Case No. 8:10-CV-336-T-TGW, 2011 U.S. Dist. LEXIS 5781, at *7 (M.D. Fla. Jan. 14, 2011).

Notwithstanding, in addition to evidence from listed acceptable medical sources, the Commissioner "may also use evidence from other sources [such as a nurse practitioner] to show the *severity* of [a claimant's] impairment(s) and how it affects [their] ability to work."  20 C.F.R. §§ 404.1513(d), 416.913(d) (emphasis added).  Further, her opinion is afforded weight to the extent that it is supported by the factors listed in 20

---

[7]  *But see supra* n.1.

C.F.R. §§ 404.1527(d), 416.927(d), including the treatment provided, the extent of the examinations and testing performed, the consistency with the other evidence, and the degree of explanation provided with the opinion. *See* Social Security Ruling (SSR) 06-3p.

The ALJ found that Ms. Myers was not an acceptable medical source. Nevertheless, the ALJ discussed her treatment notes and opinions in detail. R. 25-27. Ms. Myers' examinations and treatment notes begin in January 2007 when Plaintiff was reported not to be in any acute distress. R. 303. Conservative treatment was ordered in December 2007, R. 299, and by February 2008, Plaintiff reported feeling better and again in no acute distress. R. 297, 451. Plaintiff returned in June 2008 and in no acute distress. Clinical impressions included hypothyroidism, knee pain, and menopausal symptoms. R. 296, 450. Ms. Myers continued to report that Plaintiff was in no acute distress with an unremarkable thyroid, and without clubbing or edema through November 2009, although a diagnosis of hypertension was added. R. 438-50.

Plaintiff continued treatment at Bond Community Health Center in November 2009 complaining of a urinary tract infection. R. 281, 323. Plaintiff was evaluated and treated by Ms. Thomas in November 2009, *id.*, and Ms. Jones in July, September, and October 2009. R. 330-36. These patient notes do not support Ms. Myers opinions.

Plaintiff returned to Ms. Myers in April 2010 when she was in no acute distress, fully alert, and oriented, without thyroid masses or nodules, and had normal lab results. R. 436-37. It was not until July 2010, when Plaintiff returned to Ms. Myers for a checkup, that Plaintiff requested Ms. Myers to complete a RFC questionnaire. R. 424,

435.  Ms. Myers completed the questionnaire and opined, essentially, that Plaintiff could

not work.  R. 389-90.

Ms. Jones examined Plaintiff on July 26, 2010, and reported Plaintiff's complaints

of pain in her left ankle and left foot, due to her history of clubfeet.  Ms. Jones also

continued with her prior diagnosis of rheumatoid arthritis without citing objective

evidence or signs that substantiated this diagnosis.  R. 330-35, 436-38.

The ALJ at least implicitly considered the length of treatment afforded to Plaintiff

by Ms. Myers.  R. 25-27.  Plaintiff asserts that Ms. Myers' opinions are supported by her

notes of a July 14, 2010, examination that "revealed generalized lumbar sacral pain,

'[t]enderness in the right ankles, right greater than left,' tenderness of the feet, and

bilateral clubfeet."  Doc. 13 at 14.  The ALJ afforded "only some weight" to Ms. Myers'

opinions "[t]o the extent [her] opinions regarding the claimant's fatigue and pain are

work-related restrictions" because they were "consistent with limiting the claimant to a

reduced range of sedentary work," not that her opinions precluded Plaintiff from working

in any capacity as Ms. Myers opined in her July 2010 RFC questionnaire.  R. 26.

Substantial evidence supports the ALJ giving these opinions "only some weight."  *Id*.

The ALJ also considered Ms. Myers' responses in the RFC questionnaire and

determined they were inconsistent with her observations documented in prior and

contemporaneous treatment notes.  Substantial evidence also supports the ALJ giving

Ms. Myers' inconsistent opinions "little weight."  *Id*.

The Court agrees with the Commissioner's argument that Ms. Myers' "opinions

were extreme."  Doc. 15 at 13.  Ms. Myers opinions of July 14, 2010, that mirrored her

opinions of July 6, 2011, are not supported by her treatment notes and any clinical tests

or diagnostic reports. For example, there is no mention of x-rays, MRIs, straight-leg testing, tandem walking, or similar tests that support her opinions. (The ALJ noted that the results of an MRI that may have been performed in or around October 2010 "are absent from the record." R. 27.) Further, Dr. Holloman, the state agency physician, did not find disabling limitations when she examined Plaintiff on January 29, 2010. R. 344-45; *see* R. 26. Substantial evidence supports the weight given by the ALJ to Ms. Myers' opinions.

### 2. Plaintiff's Credibility

Plaintiff argues the ALJ improperly discounted Plaintiff's credibility based on the ALJ's improper reliance on Plaintiff's reported activities of daily living and also by failing to consider reported side effects of Plaintiff's medications. Doc. 13 at 14-16. The ALJ, however, properly discounted Plaintiff's credibility based on these and other factors. Substantial evidence supports the ALJ's credibility findings.

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain. One begins with the familiar way that subjective complaints of pain are to be evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225. *See* 20 C.F.R §§ 404.1529; 416.929 (explaining how symptoms and pain are evaluated); 404.1545(e); 416.945(e) (regarding RFC, total limiting effects). This is guidance for the way the ALJ is to evaluate the claimant's

subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.

To analyze a claimant subjective complaints, the ALJ considers the entire record, including the medical records; third-party and Plaintiff's statements; the claimant's daily activities; the duration, frequency, intensity of pain or other subjective complaint; the dosage, effectiveness, and side effects of medication; precipitating and aggravating factors; and functional restrictions. 20 C.F.R. §§ 404.1529; 416.929. The Eleventh Circuit has stated: "credibility determinations are the province of the ALJ." Moore, 405 F.3d at 1212 ("The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.").

The ALJ discussed Plaintiff's allegations of fatigue, diminished attention, mood problems, social difficulties, and neck, back, hip, and feet pain. R. 24-25. The ALJ found, however, that "while the record supports some level of functional limitations related to the claimant's impairments, it does not support such significant restrictions alleged by the claimant." R. 23. The ALJ found Plaintiff's statements "generally not credible" because her complaints were inconsistent and "the record contains observations of generally stable examination findings with no significant change in her condition." R. 28.

The ALJ may consider a claimant's daily activities when evaluating the claimant's subjective complaints of disabling pain and other symptoms. Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i). *But see* Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant

from disability).  Here, Plaintiff questions the ALJ's credibility determination because, according to Plaintiff, the ALJ placed too much reliance on Plaintiff's ability to do daily chores citing to <u>Lewis v. Callahan</u>.  Plaintiff states that her driving and performance of chores do not equate to an ability to work full time.  Doc. 13 at 16.  The ALJ did not determine, however, that Plaintiff's credibility or her ability to work full time was solely based on her daily activities.  The ALJ considered her continued ability to drive, cook, do household chores, and live independently, among other factors, in determining that Plaintiff's claims of total disability were not credible.  R. 24-25, 28.  Likewise, the ALJ considered Plaintiff's reported struggles to complete various daily tasks.  R. 25.

The ALJ also considered Plaintiff's functional abilities.  *Id.*  The ALJ considered Plaintiff's subjective complaints of pain and a general inability to function in light of the medical evidence and ultimately determined that the inconsistent reports and testimony from Plaintiff and "the fact that the record contains observations of generally stable examination findings with no significant change in her condition, detracts from the credibility of the claimant's statements as to her functional limitations and the severity of her alleged symptoms."  R. 28.

Plaintiff further argues that the ALJ did not consider the reported side effects from her medication.  Doc. 13 at 16.  The ALJ mentioned Plaintiff's "listed medication side effects of weight gain, affected speech, gas, fatigue, heartburn, sleepiness, lightheadedness, diminished concentration, blurred vision, acid reflux, nausea, and dry mouth (2F; 7E; 13E; 14E)."  The ALJ noted, however, that "no treating or examining physician has recommended work-related restrictions because of alleged medication side effects," R. 24, and Ms. Myers, in her RFC questionnaires, did not identify any side

effects of any medications which may impact Plaintiff's ability for work.  R. 389, 459; *but see* R. 423 (3/23/11 Plaintiff reported to Ms. Myers taking Diclofenac seemed to be giving her gas and heartburn).  Substantial evidence supports the ALJ's credibility determination.

### 3.  The ALJ's RFC Determination

Plaintiff argues the ALJ's reliance on the vocational expert's opinion regarding the jobs that Plaintiff can perform in the national economy is erroneous because the hypothetical question(s) did not include all of Plaintiff's limitations, such as Ms. Myers' opinion that Plaintiff's impairments will cause her to be absent from work more than four times per month, R. 389-90.  Doc. 13 at 16-17.  Plaintiff stated that "[t]his error is striking, as the VE testified that if Plaintiff were to miss more than three days of work per month, there would be no jobs in the national economy that she could perform.  [R.] 78-79."  Doc. 13 at 17.

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  Wilson v. Barnhart, 284 F.3d at 1227.  *See* Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  The ALJ is not required, however, to include findings in the hypothetical that the ALJ has properly rejected as unsupported.  *See* Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004); McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

In this point, Plaintiff reargues her prior points and suggests that the ALJ should have included the limitations expressed by Ms. Myers when posing the hypothetical questions to Ms. Jarrell, the vocational expert.  As noted above, the ALJ did not err in

rejecting the limitations suggested by Ms. Myers and did not err in rejecting the extent of Plaintiff's subjective complaints when assessing her credibility. As a result, substantial evidence supports the ALJ's determination not to include these limitations in the hypothetical question(s) posed to Ms. Jarrell. *See generally* <u>Lafferty v. Comm'r of Soc. Sec.</u>, 333 F. App'x 489, 490 (11th Cir. 2009) (unpublished) (finding substantial evidence supported ALJ's decision to discredit Plaintiff's complaints so hypothetical without limitations was proper); <u>Brown v. Astrue</u>, 298 F. App'x 851, 853 (11th Cir. 2008) (unpublished) (the court rejected a challenge to the ALJ's finding that the claimant's allegations of pain and fatigue were not credible in citing the incompatibility of the claimant's testimony and the medical records in evidence.) Stated otherwise, substantial evidence supports the ALJ's hypothetical questions posed to Ms. Jarrell that limited Plaintiff to sedentary work with limitations. R. 73-75.

## V. Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and he correctly applied the law. Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's applications for DIB and SSI *prior* to February 21, 2011, be **AFFIRMED** and that judgment be entered for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on September 3, 2013.

<u>s/ Charles A. Stampelos</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**